UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBBEN SCHAEFER MCGOVERT,<br><br>  Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY,[1]<br><br>  Defendant. | Case No. 15-cv-05213-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 13, 14 |

Plaintiff Robben Schaeffer McGovert ("Plaintiff") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. and Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*.  The Commissioner cross-moves to affirm.  For the reasons stated below, the courts **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion, and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

### I.  PROCEDURAL HISTORY

On November 30, 2011, Plaintiff protectively filed applications for Social Security Disability Insurance (SSDI) and supplemental social benefits, alleging disability beginning on January 5, 2009.  Administrative Record ("A.R.") 90-91; 212-28.  Her applications were initially denied on April 5, 2012 and again on reconsideration on December 29, 2012.  A.R. 90-111 (Initial Denial), 112-47 (Reconsideration).  On January 10, 2013, Plaintiff filed a request for a hearing

---

[1] On Jan. 20, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security.  In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant.  In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

before an Administrative Law Judge ("ALJ"). A.R. 166-67.

After the hearing, ALJ K. Kwon issued a decision finding Plaintiff not disabled. A.R. 22-34. In relevant part, the ALJ determined that Plaintiff was 1) 56 years old on the alleged disability onset date, which is defined as "advanced age" within the meaning of the Social Security regulations (*see* 20 C.F.R. §§ 404.1563(e), 414.963(e)), and later changed age categories to "closely approaching retirement age," which is age 60 or older, *see id*; 2) has the following severe impairments: "adjustment disorder with depressed and anxious mood, and degenerative disc disease of the cervical spine (20 C.F.R. §§ 404.1520(c), 416.920(c)"; 3) has acquired work skills from relevant past work as a bank teller and bookkeeper (20 C.F.R. §§ 404.1568, 416.968); 4) is able to perform her past relevant work as a bookkeeper, both as generally and actually performed;[2] and 5) has at least a high school education and is able to communicate in English. A.R. 27, 32-33. The ALJ found that Plaintiff has the residual functional capacity ("RFC") to "perform light work as defined 20 C.F.R. § 404.1567(b) and 416.967(b) [but] with no climbing ladders, ropes, or scaffolds; no more than occasional postural movements; and no working at heights or with hazardous moving machinery as a safety precaution" and "no regular interaction with the general public as a primary duty." A.R. 28. Based on these findings, and relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform other jobs existing in the economy, including typist clerk and credit clerk, the ALJ concluded that Plaintiff is not disabled. A.R. 33-34.

The Appeals Council denied Plaintiff's request for review on September 11, 2015. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g). [Docket No. 1].

---

[2] Defendant concedes in a footnote in its Opposition and Cross-Motion for Summary Judgment that Plaintiff cannot perform her past relevant work as a bookkeeper within the ALJ's restriction to semi-skilled work because the bookkeeper job has a "specific vocational preparation of 6, which corresponds to skilled work." *See* Def's Opp'n and Cross-Mot. for Summ. J. [Docket No. 14] at 2, n.1. Given this concession, the court will only consider arguments relating to the other jobs the ALJ concluded Plaintiff could perform, i.e., typist clerk and credit clerk. A.R. 33.

**II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

1.     At the first step, the ALJ considers the claimant's work activity, if any.  If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.     At the second step, the ALJ considers the medical severity of the claimant's impairment(s).  If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.     At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.     At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.     At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other

---

[3] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

1  work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is
2  not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the
3  claimant is disabled.

4      20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.   FACTUAL BACKGROUND

###     A.   Plaintiff's Testimony

7      At the hearing before the ALJ, Plaintiff gave the following testimony: Plaintiff was born
8  in 1952. A.R. 44. She was married and has children, but has lived alone since 2000. A.R. 44, 49.
9  Plaintiff completed some years of college. A.R. 45.

10      Plaintiff testified that the last time she worked was in 2009. A.R. 45, 48. Prior to 2005,
11  she worked as a bookkeeper at a construction site for five years and then as a bank teller for 3
12  years. A.R. 81. From 2005 to 2009, Plaintiff worked for John Deere as an assistant doing a
13  variety of tasks including filing, procuring and stocking supplies, answering multiple phone lines,
14  typing, and carrying cases of paper and office equipment. A.R. 80-81. In 2009, she worked as a
15  grocery clerk at Safeway for 2 months, and then as a desk clerk at the Day Inns for 10 days. A.R.
16  46.

17      Plaintiff believes that her fatigue has kept her from working. She attributes her fatigue to
18  Hepatitis C and rheumatoid arthritis. A.R. 49-50. She has had Hepatitis C for almost 40 years,
19  and finished interferon treatment for it in 2008. A.R. 50. Plaintiff now gets her liver checked
20  every 6 months. A.R. 50. Plaintiff's Hepatitis C viral load was normal as of the last sonogram,
21  but she gets it checked every year. A.R. 51.

22      Plaintiff has difficulty breathing when walking up a few flights of stairs, standing to get up,
23  and even when she is not exerting herself. A.R. 52-54. According to Plaintiff, the doctors found
24  cysts on her lungs and told her that she lost approximately 25 percent usage of her lungs. A.R. 52.
25  She goes to Vista Family Medical Health once every 1 to 2 months for a general check-up on her
26  shortness-of-breath symptoms. A.R. 53. Plaintiff uses an inhaler intermittently, but does not use a
27  nebulizer machine. A.R. 54. She still smokes, but is actively trying to quit, and usually smokes
28  fewer than 10 cigarettes per day. A.R. 55.

Plaintiff has neck pain, for which she sees a neurologist, Dr. Richard J. Mendius, 3 times per year. A.R. 55-56. Dr. Mendius wanted Plaintiff to get a block (injection) in her neck and referred her to another doctor to get this done. A.R. 57. She has not had the block performed because she is worried about having needles stuck in her neck. A.R. 57. She takes pain pills, ibruprofen, and aspirin to treat her neck pain. A.R. 57. In 2011, Plaintiff went to physical therapy 2 to 3 times per week for 6 months at Palm Hospital, but stopped going because the physical therapy seemed to aggravate her symptoms. A.R. 58-59.

Plaintiff experiences pain in both of her arms, and has difficulty using both hands. A.R. 55, 72. She feels pain, tingling, and numbness in her left arm which starts from her left shoulder and moves down into her little finger. A.R. 55. She sometimes drops items that she is holding with her left arm because she loses her grip. A.R. 72. Plaintiff can carry a gallon of milk with her right hand only. A.R. 62-63. Plaintiff feels periodic, radiating pain in her right arm. A.R. 55, 72.

Plaintiff has low back pain, and can only sit for 15 to 30 minutes each day without being in pain. A.R. 60, 75. She can sit for up to 1 to 1.5 hours before she has to stand up and stretch, but this is not an everyday occurrence. A.R. 60. Plaintiff is able to stand for approximately 30 to 45 minutes before she has to sit down. A.R. 61, 75. She feels pain down her leg, which makes it difficult to stand. She has fallen to the ground after getting up and standing out of bed due to her legs. A.R. 75-76.

Plaintiff testified that on an average day, she feeds her dog, reads, takes a nap, gets up to her dog out, and then lies back down and listens to the radio. A.R. 63, 76. She takes her dog out for a 20 to 30 minute walk once or twice a week at most. A.R. 61, 71-72. During these walks, she has to stop to sit in a bus shelter. A.R. 61-62. While Plaintiff is independent in her personal care, e.g., dressing, feeding, and bathing herself, she does not perform it on a daily basis like she used to do. A.R. 64. She does not do household chores by herself generally. A.R. 66. Her daughter will assist her with laundry once in a while. A.R. 66. Plaintiff finds that washing dishes is difficult to do now because her left arm cannot hold plates; she has to put the plates on the counter and push on them to scrub them. A.R. 66. Plaintiff drives up to twice a week; once to go to the library to check out books, and the other time to go to the store. A.R. 65. Plaintiff will go visit a friend

once in a while, but does not have a lot of friends. A.R. 65.

Plaintiff had a serious problem with methamphetamine/IV drug use. A.R. 66-67. Plaintiff stopped any extreme drug use in 2000, but occasionally used drugs until 2007. A.R. 67. She did not attend any formal rehab or detox program to stop using drugs, but instead got involved with the Buddhist church. A.R. 67-68. Plaintiff has had one or two relapses with drug use since 2007, but has otherwise been sober. A.R. 69. Plaintiff also used to have a serious problem with alcohol. A.R. 66. She drank more heavily in the past when she was more social, but does not drink heavily now since she is not as social. A.R. 70. Plaintiff does not attend AA or NA meetings. A.R. 70.

Plaintiff testified that since she has been unable to work, her depression has increased. A.R. 73-74. She finds it difficult to be around other people and to control her moods. A.R. 74. Plaintiff testified that she is prone to having good days and bad days. A.R. 77. On a bad day, she cries, feels really depressed, has a cup of tea and tries to read, but can also lay down all day, only getting up to use the restroom. A.R. 77. If her back goes out, then she can be in bed for up to two weeks. A.R. 77. In a given week, she estimates that at least 4 to 5 days are bad days; in some weeks, every day is a bad day. A.R. 78. On a good day, Plaintiff tries to read encouraging books, and, on some days, she feels "really elated." A.R. 77.

### B.      Relevant Medical Evidence

#### 1.      Examining Physician Soheila Benrazavi, M.D.

Consultative examining physician Dr. Soheila Benrazavi examined Plaintiff on November 11, 2012. A.R. 732-37. Plaintiff reported a history of Hepatitis C, COPD, chest pains, lower back pain, and neck pain. A.R. 732-33. Upon a physical examination, Dr. Benrazavi observed the following: (1) the lumbar spine showed "some tenderness along the central thoracic and lumbar region and in the area of the right sciatic notch," but was "negative" for signs of lumbar radiculopathy; 2) there was evidence of mild chronic liver disease; 3) there was a limited range of motion in the cervical spine, tenderness in the bilateral trapezius, and thus cervical radiculopathy could not be ruled out; and 4) there was negative evidence of congestive heart failure or arrhythmia. A.R. 736. Dr. Benrazavi measured the flexion and extension of Plaintiff's neck in 6 different positions, and noted that there was pain in all positions. A.R. 734 (Forward Flexion: 50

degrees with pain; Extension: 60 degrees with pain; Bend to Right: 45 degrees with pain; Bend to Left: 45 degrees with pain; Rotate to Right: 45 degrees with pain; Rotate to Left: 45 degrees with pain).

Based on the physical examination, Dr. Benrazavi opined that Plaintiff is able to lift and carry 20 pounds occasionally, and 10 pounds frequently, stand and walk up to six hours per right-hour workday, and sit for six hours out of an eight-hour workout. A.R. 736. Dr. Benrazavi limited to "occasional"[4] any activities "that require frequent turning of the neck or holding of the neck in prolonged flexed or extended positions" or " climbing and stooping," and issued "pulmonary precautions" that any work environment be "reasonably free of dust, fumes, and smoke." A.R. 736.

### 2. Treating Physician Daniel J. Creegan, Ph. D.

In February 2013, Plaintiff started attending group therapy sessions for depression with Dr. Daniel J. Creegan, Ph.D. A.R. 31, 747, 797-98, 802-03, 807-10, 813-16, 819-26, 830-37, 840-41. In April 2013, Plaintiff started attending individual therapy sessions with Dr. Creegan.[5] A.R. 31, 747. Dr. Creegan consistently rated Plaintiff with a GAF[6] score of 50 in his individual therapy session notes. A.R. 787 (June 2013); 796 (April 2013); 785 (July 2013); 783 (August 2013); 781 (September 2013). During those individual sessions, Dr. Creegan observed, among

---

[4] "Occasional" is defined as "an activity or condition that exists up to 1/3rd of the time." Appendix C at 4, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational*, U.S. Department of Labor, Employment and Training Administration (1993 ed).

[5] The ALJ states that Plaintiff began her individual therapy sessions in May 2013 with Dr. Creegan, but Dr. Creegan's notes state that Plaintiff began her individual therapy sessions in April 2013. A.R. 747. The record also has treatment notes from what appear to be individual therapy sessions in April 2013. A.R. 794. The court therefore will assume that Plaintiff began her individual therapy sessions in April 2013.

[6] "GAF" stands for Global Assessment of Functioning. The Ninth Circuit recently noted that GAF scores, which are " 'a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment,'" "may be a useful measurement." *Garrison v. Colvin*, 759 F.3d 995, 1002, n.4 (9th Cir. 2014) (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (quotation marks omitted)). A GAF score between 41 and 50 "describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning." *Id*. (internal citations omitted). A GAF score between 51 to 60 "describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning.'" *Id*. (internal citations omitted).

other things, that Plaintiff's appearance was appropriate; her orientation was alert, cooperative, and coherent; her behavior was appropriate; her attitude was cooperative; her mood was pleasant and cheerful; her affect was broad and appropriate; her speech was normal; her thought processes and content were coherent; and her judgment was intact. A.R. 795 (April 2013): 786-87 (June 2013); 785 (July 2013); 783 (August 2013); 781 (September 2013).

In October 2013, Dr. Creegan completed a Mental Impairment Questionnaire in which he diagnosed Plaintiff with Depression and Chronic Pain Syndrome, and rated Plaintiff with a GAF score of 50. A.R. 747-52. Dr. Creegan assessed that Plaintiff was unable to meet competitive standards in such skill categories as working in coordination with or proximity to others without being unduly distracted, and performing work at a consistent pace without an unreasonable number and length of rest periods. A.R. 749. Dr. Creegan further opined that Plaintiff had no useful ability to function in such skill categories as maintaining attention for hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; and completing a normal workday and workweek without interruptions from psychologically based symptoms. A.R. 749. Dr. Creegan also noted that Plaintiff had extreme difficulties in maintaining social functioning; extreme deficiencies in concentration, persistence, or pace; and had four or more episodes of decompensation[7] within a 12 month period, each episode being at least two weeks in duration. A.R. 752. According to Dr. Creegan, Plaintiff would be absent more than four days per month due to her impairments. A.R. 752.

### 3. Examining Physician Les P. Kalman, M.D.

Consultative examining psychiatrist Dr. Les P. Kalman interviewed Plaintiff on December 15, 2012. A.R. 740-44. Plaintiff's chief complaint was that she was going through a very difficult time. A.R. 740. Plaintiff reported a variety of mental-health related issues including, but not limited to, that she has felt depressed her entire life; that she was sexually abused by her father and stepbrothers, and has nightmares and flashbacks; that she felt hopeless, helpless, and worthless

---

[7] Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of: adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace." A.R. 752.

8

feelings; and that she was hospitalized once in 1999 at Marin General Hospital for a suicide attempt. A.R. 740-41.

Dr. Kalman observed the following: 1) Plaintiff was cooperative; 2) her speech was average rate and volume; 3) her eye contact was good, and 4) Plaintiff was not on any mental-health related medications. A.R. 741-42. Based on his evaluation, Dr. Kalman opined that Plaintiff is "1) able to interact with supervisors and co-workers; 2) able to deal with the public; 3) able to understand, remember and carry out detailed, but uncomplicated job instructions; 4) able to maintain attention, concentration and memory; [and] 5) psychiatrically able to withstand the stress and pressures associated with daily work activities." A.R. 743. Dr. Kalman diagnosed Plaintiff with Post Traumatic Stress Disorder and Major Depression, and rated Plaintiff with a GAF score of 50. A.R. 743-44.

### 4. Examining Physician Richard Palmer, Ph.D.

Consultative examining psychologist Dr. Richard Palmer interviewed Plaintiff on March 11, 2012. A.R. 701-06. Dr. Palmer observed the following: 1) Plaintiff's grooming was good; 2) Plaintiff presented in an outgoing, friendly manner, made good eye contact, and her facial expression was euthymic; 3) Plaintiff was able to ambulate unassisted; and 4) Plaintiff interacted appropriately with him and office staff throughout the evaluation, and that no unusual or bizarre behavior was observed. A.R. 701. According to Dr. Palmer, Plaintiff complained of chronic anxiety in the form of constant worry and depression because she can no longer take care of herself and is disappointed about "losing the dream of working 10 or 15 years and having a nest egg to retire." A.R. 701. Plaintiff reported being less social than she was previously; that she experienced "little pleasure or enjoyment;" and that she was molested as a child by her stepfather and brothers, and sporadically attends a group for women who were molested as children. A.R. 702.

Based on his mental health and clinical interview, Dr. Palmer opined that Plaintiff is "capable of managing funds," and is able to adequately perform one or two step simple repetitive tasks, adequately perform complex tasks, and perform work activities "on a consistent basis without special or additional instructions." A.R. 705. Dr. Palmer further opined that Plaintiff "has

9

a fair ability" to accept instructions from and interact with coworkers and the public. He noted that mental health symptoms may impact Plaintiff's attendance and ability to handle work stress, but that taking that into account, she has a fair ability to maintain regular attendance in the work place, a fair ability to complete a normal workday or workweek without interruptions from a psychiatric condition, and a fair ability to handle normal work related stress from a competitive work environment. A.R. 705. Dr. Palmer diagnosed Plaintiff with Adjustment Disorder with Depression, and rated Plaintiff with a GAF score of 58. A.R. 704.

### 5. Non-Examining State Agency Medical Consultants

Joshua D. Schwartz, Ph.D, a state agency medical consultant, completed a case analysis on March 30, 2012, and opined that Plaintiff did not present evidence of a severe mental impairment. A.R. 97-98.

David E. Gross, another state agency medical consultant, completed a case analysis on December 24, 2012 and affirmed the initial assessment made by Dr. Schwartz. A.R. 121-22.

### C. Vocational Expert

Vocational expert Steve Schmidt testified that an individual with the following restrictions could still perform work as a typist clerk, file clerk, and administrative clerk: restriction to light work; occasionally performing postural work, but not climbing ladders, ropes, or scaffolding; no work at unprotected heights or with heavy or hazardous machinery; maximum SVP of 4[8]; and no regular interaction with the general public. A.R. 84-856. Schmidt also testified that an individual with all of the above restrictions except reducing the exertion level to sedentary could still perform work as a typist clerk and credit clerk. A.R. 85-86. Schmidt opined that an individual who missed work days pretty frequently on a regular basis could not sustain any type of competitive work. A.R. 86. He further testified that an individual who was also unable to use his or her non-dominant hand 30 percent of the time would be precluded from work as a typist clerk and credit

---

[8] " 'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, p.1009 (4th ed. 1991). An SVP of 4 corresponds to semi-skilled work. *Id*.

1  clerk. A.R. 86-87. Lastly, Schmidt opined that an individual who was off-task 20 percent of the
2  time would be unable to sustain any type of competitive work. A.R. 87.

### IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V. DISCUSSION

On appeal, Plaintiff contends that the ALJ erred (1) in rejecting portions of the opinions of an examining physician, and (2) in failing to properly evaluate Plaintiff's mental impairments in determining Plaintiff's RFC. The court considers each argument in turn.

#### A. The ALJ's Assessment of the Medical Opinion of Examining Physician Dr. Benrazavi

Plaintiff first argues that the ALJ failed to articulate specific and legitimate reasons for rejecting the portion of examining physician Dr. Benrazavi's opinions regarding Plaintiff's neck

11

and pulmonary restrictions.

### 1. Legal Principles

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. While an ALJ is not required to adopt all of an examining physician's assessment, *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989), an ALJ is required to explain the reasons for rejecting those portions of an examining physician's assessment that the ALJ chooses not to adopt. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 n.10 (9th Cir. 2007). When an examining physician's assessment is uncontradicted, the ALJ should provide "clear and convincing" reasons for rejecting that opinion. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *see also* 20 C.F.R. § 416.927(d)(2). Even if "[t]he opinion of an examining doctor" is "contradicted by another doctor," the ALJ should provide "specific and legitimate reasons that are supported by substantial evidence in the record" for rejecting the opinion. *Lester*, 81 F.3d at 830–31 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995)). Ignoring portions of a physician's opinion is considered an implicit rejection of those opinions and the failure to offer reasons for doing so is legal error. *See Smolen v. Chater*, 80 F.3d 1273, 1286 (9th Cir. 1996).

### 2. Analysis

#### a. Dr. Benrazavi's Opinions Regarding Plaintiff's Neck Limitations

The ALJ erred in failing to articulate specific and legitimate reasons for implicitly rejecting Dr. Benrazavi's opinions regarding Plaintiff's neck restrictions. The ALJ acknowledged that Dr. Benrazavi "concluded that the claimant was capable of a light exertional level with reduced postural movements and precautionary environmental limitations," and gave the opinion "great weight." A.R. 30. However, the ALJ did not discuss that Dr. Benrazavi also opined that Plaintiff was limited to occasional activities that require frequent turning of the neck or holding of the neck in prolonged flexion (looking down) or extension (looking up) positions, or that Dr. Benrazavi specified that the "pulmonary precautions of the work environment [should be] reasonably free of dust, fumes, and smoke." A.R. 736. The ALJ also did not include these limitations when

formulating Plaintiff's RFC, nor did the ALJ explain the reasons for ignoring or excluding these specific limitations. Given the requirements governing the treatment of an examining physician's opinions, as discussed above, the ALJ should have made a determination about whether Dr. Benrazavi's opinion of Plaintiff's neck and pulmonary restrictions was contradicted or supported by any other doctor, and provided reasons for rejecting those opinions. Moreover, since the ALJ incorporated some, but not all, of the limitations identified by Dr. Benrazavi into the formulation of Plaintiff's RFC, and did so without explanation, it cannot be said that "substantial evidence" supports the ALJ's RFC assessment. *See Lingenfelter*, 504 F.3d at 1040.

### b.     Harmless Error

Defendant concedes that the ALJ did not consider Dr. Benrazavi's neck restrictions in formulating Plaintiff's RFC. *See* Def's Opp'n and Cross-Mot. to Summ. J. [Docket No. 14] at 2. Defendant argues that the error was harmless because based on the Dictionary of Occupational Titles ("DOT"), the jobs the ALJ identified that Plaintiff could perform, i.e., typist clerk and credit clerk, do not require prolonged flexion, extension, or frequent turning of the neck. *See* Def's Opp'n and Cross-Mot. for Summ. J. [Docket No. 14] at 3-4. Defendant's argument is unpersuasive for several reasons.

To begin with, common sense dictates that working as a typist clerk or credit clerk primarily involves typing and looking at computer screens. Indeed, the DOT descriptions relied upon by Defendant reflect this. *See* Clerk-Typist, DOT 203.362-010, 1991 WL 671685 ("compiles data and operates typewriter or computer in performance of routine clerical duties . . . : [t]ypes reports, business correspondence, application forms, shipping tickets, and other material"); Credit Clerk, DOT 205.367-022, 1991 WL 671717 (fills out loan and credit applications; "writes to credit bureaus, employers, and personal references to check credit and personal references;" "[m]ay compute interest and payments, using calculator;" "[m]ay check value of customer's collateral . . ."). Given the nature of these jobs, it would be important for the ALJ to obtain facts to analyze whether a typist clerk or credit clerk would need to hold the neck in a prolonged flexion (looking down) position, or in an extended flexion (looking up) position for more than one third of the time, while engaged in typing and looking at a computer screen during a normal workday.

13

In addition, other activities described in the DOT job descriptions appear to suggest the need for prolonged neck movement. For example, the DOT job descriptions specify frequent reaching (i.e., one third to two thirds of the time). *See* Clerk-Typist, DOT 203.362-010, 1991 WL 671685; Credit Clerk, DOT 205.367-022, 1991 WL 671717. Frequent reaching might well involve the frequent turning of the neck to reach an item, depending on where the item is located and how often the item is needed. The record should be developed to explore these questions.

*Chavez v. Astrue*, No. CV 11-1351-PLA, 2012 WL 407152, at *6 (C.D. Cal. Feb. 9, 2012), cited by Defendant, is factually inapposite. In *Chavez*, the plaintiff's treating physician opined that the plaintiff should be precluded from "repetitive motions of the neck or spine." *Id*. at *6. The district court found that the ALJ's failure in discussing the treating physician's specific finding that plaintiff should be precluded from repetitive motions of the neck or the spine was harmless error because the "DOT's description of the job of battery inspector [gave] no indication that the job [required] repetition motions of, or any significant flexing, extending, bending, or rotating of, the neck or spine." *Id*. The DOT description of the job of battery inspector reflected that the position did not require any "climbing, balancing, stooping, kneeling, crouching, or crawling, each of which would involve some neck or spine movement." *Id*. Unlike *Chavez*, in this case it is unclear from the DOT descriptions alone whether being a typist clerk or a credit clerk would require occasional prolonged or extended neck flexion, or frequent turning of the neck. *See Booz v. Sec'y of Health and Human Servs*., 734 F.2d 1378, 1381 (9th Cir. 1984) (explaining that an error is not harmless where "there is a reasonable possibility that [the new evidence] would have changed the outcome of the present case").

Here, the ALJ did not include Dr. Benrazavi's neck restrictions in the hypotheticals provided to the VE, who opined that a person with the restrictions identified by the ALJ could still perform work as a typist clerk or credit clerk. *See Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 690 (9th Cir. 2009) ("The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, 'must set out *all* the limitations and restrictions of a particular claimant.' ") (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (emphasis in original); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) ("If a vocational expert's hypothetical does

14

1  not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to
2  support a finding that the claimant can perform jobs in the national economy.") (internal quotation
3  marks and citation omitted).  It is possible that had the ALJ included Dr. Benrazavi's neck
4  limitations in the VE's hypotheticals, the VE would have determined that Plaintiff could not
5  perform the work of a typist clerk or credit clerk.  *Compare Wolfinbarger v. Comm'r of Soc. Sec.*,
6  No. 2:12-CV-0174-CMK, 2014 WL 788787, at *5 (E.D. Cal. Feb. 25, 2014) (cited by Defendant)
7  (explaining that the VE's testimony that the plaintiff could perform the job of a teacher's aide,
8  considering her neck limitations, did not conflict with the DOT description of the teacher's aide
9  position which "express[ed] no clear limitations regarding the neck movements").

The court cannot say that the ALJ's failure to discuss Dr. Benrazavi's opinions regarding Plaintiff's neck limitations was harmless error.  Accordingly, the court remands the matter to the ALJ for further consideration of Dr. Benrazavi's opinions regarding Plaintiff's neck limitations.  *See Robbins v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 728 (9th Cir. 2011) (explaining that an error is harmless where it is "inconsequential to the ultimate nondisability determination") (citation and internal quotation marks omitted).

### c. Dr. Benrazavi's Medical Opinions Regarding Plaintiff's Pulmonary Restrictions

Because the court finds that remand is appropriate regarding Dr. Benrazavi's opinions regarding Plaintiff's neck limitations, the court also remands Dr. Benrazavi's opinions regarding Plaintiff's pulmonary restriction, i.e., requiring that any work environment be "reasonably free of dust, fumes, and smoke restrictions for further consideration.  A.R. 736.  The ALJ stated that Dr. Benrazavi provided "precautionary environmental limitations"  for Plaintiff's work environment, but not specifically discuss what those limitations were.  Thus, it is unclear whether the ALJ referred to some or all of Dr. Benrazavi's pulmonary restrictions for Plaintiff's work environment.  Nor did the ALJ include this or similar environmental restrictions in its hypotheticals to the VE.  On remand, the ALJ must clarify whether, and to what extent, it is considering Dr. Benrazavi's pulmonary restrictions in evaluating Plaintiff's RFC.

15

### B. The ALJ's Assessment of Plaintiff's Mental Impairment

Plaintiff next argues that the ALJ erred in failing to properly account for the severity of Plaintiff's mental impairments as discussed in the opinions of the three medical providers who opined about them: Dr. Creegan, Dr. Palmer, and Dr. Kalman.[9] *See* Pltf's Mot. for Summ. J. [Docket No. 13] at 7-13. Defendant contends that the ALJ properly accounted for Plaintiff's mental impairments by restricting Plaintiff to semi-skilled tasks, as well as prohibiting Plaintiff from regular interaction with the general public. *See* A.R. 32 (restricting Plaintiff to "semi-skilled tasks" based on a "combination of the [Plaintiff's] pain complaints and emergent secondary depression and anxiety," and "resolv[ing] doubt considerably in favor of the [Plaintiff] despite a lack of any significant findings within mental health treatment records"). The court construes Plaintiff's argument as asserting that the ALJ's conclusion that Plaintiff could perform semi-skilled tasks, provided that she did not have regular interaction with the general public, was not supported by substantial evidence given the evidence of the severity of her mental impairment in the record.

In assessing Plaintiff's argument, the court is mindful that the ALJ is tasked with weighing the evidence and resolving any conflicts in the evidence, *see Magallanes*, 881 F.2d at 751, and that it must affirm the ALJ's decision if it is supported by substantial evidence, even if the evidence is susceptible to a different interpretation. *See Jamerson*, 112 F.3d at 1066.

Having reviewed the record, considering carefully the opinions of the aforementioned physicians and the ALJ's decision, the court finds that the ALJ's assessment of Plaintiff's mental impairments is supported by substantial evidence. The court will discuss each of the three physician's opinions in turn.

---

[9] While there were two non-examining state agency doctors who assessed Plaintiff's mental impairments, (Dr. Schwartz and Dr. Gross), it appears that the ALJ did not credit their opinions that Plaintiff did not have a severe mental impairment. A.R. 32 (explaining that the "consultants did not have the benefit of examining the subsequent treatment records" and resolving doubts in favor of Plaintiff with respect to her mental impairments). Both parties do not dispute that the ALJ did not give much weight, if any to these opinions. *See* Pltf's Mot. for Summ. J. [Docket No. 13] at 11:7-14; Def's Opp'n and Cross-Mot. for Summ. J. [Docket No. 14] at 8:14-20. Therefore, the court will not discuss their limited opinions here.

### 1. Dr. Creegan - Treating Physician

In contending that the ALJ did not properly account for the severity of Plaintiff's mental impairments, Plaintiff leans heavily on Dr. Creegan's October 2013 Questionnaire and his GAF ratings .

The court finds that the ALJ did not err in assigning "little-to-no weight" to Dr. Creegan's October 2013 assessment of Plaintiff's mental health because these findings were inconsistent with Dr. Creegan's own contemporaneous treatment records. A.R. 31. While Dr. Creegan opined that Plaintiff was unable to meet competitive standards, had no useful ability to function in numerous skill categories, had extreme difficulties in maintaining social functioning, and extreme difficulties of concentration, persistence, or pace, (A.R. 747, 749), he nonetheless observed otherwise unremarkable results from his mental health status examinations in his individual therapy sessions, the latest of which occurred one month prior to his October 2013 assessment. A.R. 795 (April 2013): 786-87 (June 2013); 785 (July 2013); 783 (August 2013); 781 (September 2013). *See Jamerson*, 112 F.3d at 1066; *see also Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (ALJ gave clear and convincing reasons for rejecting treating physician's conclusion that the plaintiff was totally disabled where, among other things, the treating physician's total disability conclusion was contradicted his own contemporaneous finding that the plaintiff was only temporarily disabled).

Additionally, as discussed by the ALJ, Dr. Creegan's October 2013 assessment was inconsistent with the findings of two examining physicians, Dr. Palmer and Dr. Kalman. *See Andrews*, 53 F.3d at 1041 (explaining that "[w]here the opinion of the [plaintiff's] treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict") (citing *Magallanes*, 881 F.2d at 751). Dr. Palmer opined that Plaintiff had a fair ability to accept instructions, and interact with coworkers and the public, and to complete a normal workday or workweek without interruptions from a psychiatric condition. Dr. Palmer also opined that Plaintiff had no social or intellectual impairments. A.R. 705. Similarly, Dr. Kalman opined that

17

Plaintiff was able to interact with supervisors and co-workers, and understand, remember and carry out detailed but uncomplicated job instructions. A.R. 743.

The court also finds that the ALJ did not err in rejecting Dr. Creegan's GAF scores of 50 as inconsistent with his own clinical evidence from the mental health examinations during Plaintiff's individual therapy sessions. While the GAF scores of 50 are indicative of a serious impairment, the ALJ properly could conclude from the record that the results of Plaintiff's mental health examination do not appear to support that finding. During these individual sessions, Dr. Creegan repeatedly observed that Plaintiff was normal and functional, specifically that her appearance was appropriate; her orientation was alert, cooperative, and coherent; her behavior was appropriate; her attitude was cooperative; her mood was pleasant and cheerful; her affected was broad and appropriate; her speech was normal; her thought processes and content were coherent; and her judgment was intact. A.R. 795 (April 2013): 786-87 (June 2013); 785 (July 2013); 783 (August 2013); 781 (September 2013).

### 2. Dr. Palmer

Plaintiff contends that the ALJ did not account for Dr. Palmer's opinion that Plaintiff's ability to interact with supervisors and coworkers was only fair. *See* Pltf's Reply [Docket No. 15] at 15:11-16:4. Plaintiff's argument is unpersuasive for several reasons. First, Plaintiff does not explain how Dr. Palmer's opinion that Plaintiff had a fair ability to interact with supervisors and co-workers and had no "social impediments," conflicts with the ALJ's limitation that Plaintiff could not have regular interaction with the general public. Second, Plaintiff selectively summarizes Dr. Palmer's opinion. In addition to opining that Plaintiff had a fair ability to interact with supervisors and co-workers, Dr. Palmer also opined that Plaintiff had "no social impediments" and had a fair ability to handle work related stress from a competitive work environment. A.R. 705. To the extent that there was any inconsistency in Dr. Palmer's opinion, the ALJ was entitled to resolve that conflict. *See Jamerson*, 112 F.3d at 1066. Moreover, the ALJ's conclusion is supported by examining physician Dr. Kalman, who opined that Plaintiff was able to interact with supervisors, and co-workers, and deal with the public. A.R. 743.

//

### 3. Dr. Kalman

Plaintiff challenges the ALJ's consideration of Dr. Kalman's opinion in three ways, none of which demonstrates that the ALJ erred. First, Plaintiff contends that the ALJ failed to afford greater weight to Dr. Kalman's rating of a GAF score of 50, as well as to his diagnosis that Plaintiff had post-traumatic stress disorder and major depression. *See* Pltf's Mot. for Summ. J. at 9:9-18. However, Plaintiff selectively quotes from Dr. Kalman's opinion. Dr. Kalman also opined that Plaintiff was 1) able to interact with supervisors and co-workers; 2) able to deal with the public; 3) able to understand, remember and carry out detailed, but uncomplicated job instructions; 4) able to maintain attention, concentration and memory; [and] 5) psychiatrically able to withstand the stress and pressures associated with daily work activities." A.R. 743. To the extent there was an inconsistency within Dr. Kalman's assessment of Plaintiff's mental health, the ALJ was charged with resolving that inconsistency, and was entitled to discount the portions of Dr. Kalman's opinion that the ALJ believed were not fully supported.

Second, Plaintiff argues that the ALJ incorrectly interpreted what Dr. Kalman meant by his use of the word "able," and that even if the ALJ's interpretation was correct, Dr. Kalman limited Plaintiff to uncomplicated job instructions. *See* Pltf's Mot. for Summ. J. [Docket No. 13] at 9:19-10-2. According to Plaintiff, Dr. Kalman's limitation of Plaintiff to "uncomplicated" work seems to correspond to a limitation to unskilled work, which would support a finding of disability. *Id*. at 10:7-18. However, the ALJ's interpretation of the word "able" as meaning "ability to perform a task" was reasonable, given the word's plain meaning as well as the other unremarkable findings in Dr. Kalman's exam. To the extent there could have been another interpretation of the word "able" in this context, the court cannot substitute its judgment for that of the ALJ. *See Jamerson*, 112 F.3d at 1066.

Additionally, Plaintiff's argument that Dr. Kalman limited Plaintiff to just "uncomplicated work" ignores the full context in which Dr. Kalman's opinion occurs. Dr. Kalman opined that Plaintiff was able to "understand, remember, and carry out detailed, but uncomplicated job instructions," as well as "maintain attention, concentration, and memory" and interact with supervisors, co-workers, and the public. A.R. 743. Considering all these findings, the court

1 cannot conclude, and Plaintiff has not pointed to specific evidence in the record, that the ALJ erred
2 in concluding that Plaintiff could perform semi-skilled work.

3 Finally, Plaintiff points out in her reply that the jobs of typist clerk and credit clerk do not
4 necessarily involve "uncomplicated" instructions, and Defendant has not negated the possibility
5 that semi-skilled work could involve complicated job instructions. *See* Pltf's Reply [Docket No.
6 15] at 12:12-13:13. Here, Plaintiff speculates. The fact that there is a mere possibility that the
7 jobs identified by the VE could involve more complicated job instructions does not automatically
8 lead to the conclusion that the ALJ's overall assessment was erroneous. Furthermore, the job
9 descriptions themselves do not suggest that any job instructions would be routinely or inherently
10 complicated. *See* Clerk-Typist, DOT 203.362-010, 1991 WL 671685; Credit Clerk, DOT
11 205.367-022, 1991 WL 671717. The ALJ did not err in assigning "great weight" to Dr. Kalman's
12 opinion that Plaintiff demonstrated unremarkable results from a mental health status examination
13 and that Plaintiff could perform detailed, but uncomplicated instructions with no social interaction
14 or concentration problems. A.R. 31.

## VI. CONCLUSION

For the foregoing reasons, the Court finds that the ALJ erred in failing to address Dr.
Benrazavi's neck and pulmonary opinions. The court remands this portion of the case for further
proceedings consistent with this opinion.

The Court finds that the ALJ did not err in assessing Plaintiff's mental impairments, and
therefore affirms the ALJ's finding that limited Plaintiff to semi-skilled work with no regular
general interaction with the public.

Therefore, the court grants in part and denies in part Plaintiff's Motion for Summary
Judgment, and grants in part and denies in part Defendant's Cross-Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: March 15, 2017



Donna M. Ryu
United States Magistrate Judge